## CAMPBELL v. OSKEY. (No. 1286.)

(Court of Civil Appeals of Texas. El Paso. Jan. 26, 1922. Rehearing Granted March 10, 1922.)

Usury ⚖➔37—Absolute agreement to repay amount received and specified amount in addition thereto held a usurious transaction; "interest."

Where plaintiff borrowed a certain amount from defendant, for the purpose of engaging in a business venture, under an absolute agreement that such amount, and a specified amount in addition thereto, would be repaid, the additional amount constituted "interest" within usury statute, as a matter of law, under Rev. St. art. 4973, defining "interest," and not an amount to be paid defendant as his share of the profits for advancing money.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interest.]

Appeal from El Paso County Court, at Law; J. M. Deaver, Judge.

Suit by W. W. Oskey against A. J. Campbell. Judgment for plaintiff, and defendant appeals. Affirmed.

Lea, McGrady, Thomason & Edwards, of El Paso, for appellant.
J. A. Gillett, of El Paso, for appellee.

HARPER, C. J. Appellee, W. W. Oskey, sued appellant, A. J. Campbell, in El Paso county court at law, alleging that on or about March 13, 1920, he borrowed $750 from Campbell, which he subsequently repaid with usurious interest amounting to $300, by reason of which he, said defendant, was indebted to him in the sum of $600, for which he asked judgment.

Defendant replied by general demurrer and general denial.

At the close of the testimony the trial judge peremptorily instructed the jury to return a verdict in favor of plaintiff for the full amount sued for, and, based on such directed verdict, judgment was rendered against defendant for $600.

The assignment is that it was reversible error to give a peremptory charge, and the proposition is:

"Proposition I. The plaintiff's right to recovery herein depended on whether the sum of $300 which he had paid to defendant in addition to $750 originally furnished by defendant was in fact paid as usurious interest or as a part of the profits derived, or to be derived, from a joint enterprise in the sale of certain jewelry which had been theretofore pledged by a third person and redeemed as a speculation by plaintiff with the $750 advanced by defendant. There was a sharp conflict in the testimony on this, the crucial point in the case, and it was error for the trial judge to invade the province of the jury as triers of fact and

peremptorily direct them to return a verdict in favor of plaintiff against defendant."

This proposition is well taken. The undisputed evidence is that the $750 was used to purchase jewelry of the value of $1,800 or more.

The plaintiff testified that it was a loan to him at 10 per cent. per month for 60 days, but defendant testified that interest was not mentioned, but that he was to have $300 of the profits to be derived from the purchase. There are statements in the record by the latter and a letter written by him that indicate that the transaction was simply a loan at usurious interest, but another witness, shown to be disinterested, testified clearly that he overheard the conversation between the parties, and that the proposition was that the $300 was to be defendant's share of the profits for advancing the money. So clearly it was a question for the jury to determine from the credibility of the witnesses and the weight to be given to their testimony.

Reversed and remanded.

### On Rehearing.

HIGGINS, J. Upon further consideration the conclusion has been reached that the undisputed evidence discloses a usurious transaction and that the trial court properly gave a peremptory instruction in favor of the appellee.

The appellant testified:

"Mr. Oskey applied for a loan to take out or buy some jewelry from a man named Stein. Mr. Oskey came to me about wanting to borrow $750 about Saturday noon, near the middle of the day. He said he had these diamonds in sight and wanted to get them. I didn't want to let him have the money, and told him I didn't have the money to spare. He insisted he had $1,800 worth of diamonds, that he would consider it an everlasting favor, and he would also give me $150 within 10 days, and he would give me a note for $900, due in 60 days, which he did, and the note run for over a year, and he never said a word about it, and I told him I wanted my money, and he came in and wanted to take half of the jewelry and pay half of it, but I told him, 'No, I wanted all my money.' I was in need of money at that time; I needed it bad and was borrowing money. When Mr. Oskey first approached me about getting the $750 from me to take that jewelry, he came up in the big hall in the lobby of the hotel. There were two or three people there. Mr. Wood was there. I remember Mr. Schutes; he sit around the lobby as well as I remember. I don't know whether any of the other people heard the conversation or not. He represented to me that the jewelry was worth $1,800. His idea in picking it up for $750 was he was figuring on getting a big gain out of it. He was to give me $150 in 10 days and $150 in 60 days. That $300 was for a part of the profits from the jewelry for the transaction; to finance the deal. That was all I was to get. That was $300. There wasn't anything said about any

⚖➔For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

rate of interest on the note, never mentioned. I was to be a partner in the profits to the extent of $300. Mr. Oskey was to get the balance of the profits. * * *

"I told Mr. Oskey I didn't want the jewelry; I wanted my money, $750, and $150 in 10 days. He didn't pay it in 10 days; it was 60 days. I collected the $300. When he paid me that $150 in about 60 days, he did not say anything about or making a demand on me to credit that $150 on the note. No mention was made of it. He was to pay the face of this note in 60 days. The note was made for $900. That additional $150 was part of the profits. That amounted to $300 guaranteed profits. * * *

"I held the jewelry because I wanted some security for my money. I had $750 in hard-earned money tied up and I wanted some security. When he paid me the $900, I turned all the jewelry over to him, note and everything. I am not charging him any interest at all; interest is not mentioned even in the note there. I didn't charge him any interest. I was not to get anything besides the $300 out of the transaction. * * *

"I let Oskey actually have $750. In final settlement he paid me $300. He refunded the $750. When I advanced the $750, I took the jewelry as security. When I let him have this money, I expected the refund to me of every dollar that I let him have, and I was secured by jewelry that I said is probably worth $1,800. I did not advise Oskey before I would release this jewelry he must pay me $150 more than he had already paid me, or he would not get it. I wanted the face of the note. He had already paid me $150. I told him he must pay me $900 or he could not get that jewelry, the face of the note. He used $750 of my money for about 15 months. Interest was not mentioned. The consideration for which Mr. Oskey paid me $300 was as part of this contract, this jewelry that he was getting for $750 and going to sell for $1,800; that was why he paid me the $300. The use of the $750 had nothing to do with the $300; no interest was mentioned. Mr. Oskey paid me the $300 for financing this transaction. It was not for the loan of $750, but financing; letting him have $750 financing this deal. I let him have $750. If there had been no profit, my attitude toward the repayment was I had $1,800 worth of jewelry to keep. I would have kept the $1,800 worth of jewelry if he had not refunded to me the $750. I demanded that Mr. Oskey pay the $300 because he had made the proposition; it was his own proposition. He was not under obligation to pay me $300 for any other reason except he borrowed from me $750 and he was getting the $1,800 worth of jewelry, and he wanted the jewelry and was willing to give me $300 to finance the deal. The only consideration I gave Oskey for the $300 was the loan of the $750. Interest was not mentioned. I did not intend or expect Oskey to refund to me the $750 with 8 or 10 per cent. if there had been no profit at all. I expected $300. If there had been no profit, my intention relative to the repayment of the $750 was he would have to pay me $300 on this contract just the same, or I would keep the jewelry. Regardless of any jewelry, I would have required him to pay me $1,050."

A letter written by Campbell to Oskey reads:

"Your letter recd. O. K. Glad to hear from you. You spoke of the jewelry. You remember what I said to you when I came out of the pond shop; told you I didn't want it but was doing it to accommodate you. The agreement was you remember that you was to give me $150.00 for the loand, not interest—for 60 days—if you paid it in less, I was to have the $150 just the same—now about 3 days after the 60 days was up you paid me $150, and promised to take it out in six months. Now it has been eleven months. You seem to think the $150 paid me applyed to the interest, now it was your own propersition to give me the 150 for the loand for the 60 days I have about $1,800.00 worth of stuff and if you want it you send me $900 and I will send you all the stuff. I also hold a note against you for $900. Will send same to you. Now if you want this stuff will give you 30 days to fix it up for I need the money as I am building a new hotel. Let me hear from you as ever." ·

William Wood, witness for appellant, testified:

"I remember a conversation between Mr. Oskey and Mr. Campbell some time along the early part of last year about a loan of some money and sale of some jewelry. This was about the middle of March, 1920. It occurred in the lobby of the Tri-State Hotel. Mr. Campbell, Mr. Oskey, and some one else was present. In regard to these two men, I was sitting in a chair two or three feet of the desk. The conversation, as I remember it, was Mr. Oskey said some fellow had pawned some diamonds for $750, and Mr. Oskey knew about it, or found out about it, and believed the diamonds were worth $1,800 or $2,000, and he came to Mr. Campbell to get him to finance him for the $750 which the diamonds were pawned for to get these diamonds which this fellow had who was down and out, and he figured the diamonds were worth about $1,800 or $2,000 and were in soak for $750, and that he would give him part of the profits, and Mr. Campbell didn'tł want him to have the money and told him he was figuring on building him a new hotel, or furnishing a hotel, and he was pretty hard pressed for money. Mr. Oskey insisted on him letting him have the money, and, finally, I think he agreed to finance Oskey in the proposition, and the way I understood it he was to get $300 of the profit which Mr. Oskey figured he would make on the diamonds; that was about as much as I heard of it. I understood they closed on that basis. * * *

"I understood the conversation that Mr. Oskey wanted to get some diamonds some fellow had pawned, was the way I understood it. Mr. Campbell didn't want to furnish the money, but he finally agreed to furnish it. He was to get $300 as his share of the profits that Mr. Oskey was to make off of these diamonds, was what he was to get for the use of this $750. I didn't hear anything concerning the repayment of the $750. I didn't hear anything at all about what was said about paying for the use of the money in the event there was no profit. The way I understood it was that Mr. Campbell was to get $300 of the

profits which Mr. Oskey figured he would make and $350 or $400 for himself, probably more, and that he was to give Mr. Campbell, pay Mr. Campbell, $150 within a few days, probably 10 days, and give him a note for $900 payable within 60 days. I think that is correct. * * *

"He said Mr. Oskey got the diamonds for $750 and figured on making a profit of $1,000, and he was to get $300 of the profits; that was the extent of what he told me about it. He told me he had the diamonds holding them as collateral security, and he held a note for $900. Mr. Oskey was to give him $150 within a short time. * * * Mr. Campbell told me, when he showed me the diamonds, that these are the diamonds which Mr. Oskey had purchased for $750, speculated on, expected to sell them at a profit, and he was to get $300 of the profit which Mr. Oskey was to make on them."

The foregoing is all of the evidence bearing upon the question from appellant's standpoint.

Article 4973, R. S., provides that "interest" is the compensation allowed by law or fixed by the parties to a contract for the use or forbearance or detention of money.

"According to this article, as we analyze it, the use of money referred to is that which is contracted for when a loan is made." Parks v. Lubbock, 92 Tex. 635, 51 S. W. 322. In Bexar, etc., v. Robinson, 78 Tex. 163, 14 S. W. 227, 9 L. R. A. 292, 22 Am. St. Rep. 36, the court quoted with approval Endlich on Building Associations, § 358, as follows:

"The essential elements of a usurious contract consist of a loan with the understanding that the money loaned is to be returned, and that a greater rate of interest is paid than the statute allows. Whether this be done directly or indirectly or whatever may be the form or phase the contract assumes, is altogether immaterial."

In Jackson v. Cassidy, 68 Tex. 282, 4 S. W. 541, it was said:

"In the ordinary affairs of life, money advanced upon such securities, with the understanding that both principal and interest may be collected by realizing upon the securities, is considered a loan. A debt is created; otherwise the party advancing the money has no right to recover principal together with interest on the amount advanced. Having the full effect of a loan, it must be treated as such, considered in reference to our usury laws, otherwise the few features of the transaction which give it a different appearance would furnish a device by which these laws might be evaded altogether."

The evidence quoted shows an absolute obligation upon the part of Oskey to repay the $750 advanced to him by Campbell with the additional sum of $300. It matters not how the parties considered the matter. The controlling fact is that the evidence shows an agreement to repay the principal with an additional $300 for the use of the same. This, under the statute and decisions construing the same, is a usurious agreement.

The appellant's position is thus summarized by him in his reply to the motion for rehearing:

"Before 'usury' in the legal significance of the term is established, the following elements and essentials must be proved by a preponderance of credible evidence:

"1. A loan of money, as distinguished from an advance of working capital.

"2. An agreement between the parties that the principal shall be paid absolutely.

"3. The exaction of a greater compensation than allowed by law for the use of the money by the borrower, as such.

"4. The intention to violate the usury law.

"The absence of any one of these elements conclusively refutes the claim that the parties have been guilty of usurious practice."

Tested by the rule relied upon by appellant, the evidence in our opinion conclusively evidences a loan as distinguished from an advance of working capital to a joint adventure, because there was an absolute agreement between the parties that the principal was to be repaid. As to the third element insisted upon by appellant, plainly the additional $300 was the compensation agreed upon for the "use" of the money.

As to the intention to violate the usury law, the contract speaks for itself. The intent is apparent. See Bank of U. S. v. Waggener, 9 Pet. 400, 9 L. Ed. 171, where it is said:

"Where, indeed, the contract upon its very face imports usury, as by an express reservation of more than legal interest, there is no room for presumption, for the intent is apparent; res ipsa loquitur."

For the reasons indicated, the motion for rehearing is granted, and the judgment affirmed.